# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

**ROCKY HANCOCK,**

    Plaintiff,

v.

**CITY OF MOULTRIE, GEORGIA, AND MOULTRIE POLICE DEPARTMENT**,

    Defendants.

Civil Action No. 7:13-CV-21 (HL)

## ORDER

Before the Court is the Motion for Summary Judgment (Doc. 17) filed by Defendants City of Moultrie, Georgia ("City of Moultrie") and the Moultrie Police Department ("MPD" or "the Department"). Because of the reasons stated below, the motion is granted.

**I.     Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Local Rule 56, the facts listed in the movant's statement of material facts will be deemed admitted as undisputed unless the non-movant denies each specific fact and provides a supporting citation to the factual record. M.D. Ga. L.R. 56. However, even if the non-movant fails to offer adequate objections under Local Rule 56, a court may not accept at face value the movant's depiction of the facts. United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004). A court must review the record to determine for itself whether the motion for summary judgment is supported by the evidence and that there is no genuine issue of material fact. Id.; see also Reese v. Herbert, 527 F.3d 1253, 1268-69 (11th Cir. 2008).

**II.     Factual Summary**

Plaintiff Rocky Hancock ("Plaintiff") has not responded with specific record citations to the statement of undisputed material facts filed by the MPD and the City of Moultrie (collectively "Defendants). Thus, these facts are deemed admitted to the extent there is some evidence to support them.

Plaintiff, a Caucasian male, was hired by the MPD as a police officer in April 2009, and he is still working there. Although Plaintiff was not certified as a police officer before being hired, the MPD paid for him to attend the police training academy and obtain his certification. (Defendants' Statement of Undisputed Material Facts ("DSMF"), Doc. 18, ¶¶1-4; Deposition of Plaintiff, Doc.

22, pp. 25-26). Frank Lang ("Chief Lang") has been the chief of police in Moultrie during the entire time that Plaintiff has been with the MPD. (Affidavit of Frank M. Lang, Sr., Doc. 20, ¶3).

In addition to working for the MPD, Plaintiff also serves in the United States Air Force Reserve. During 2011 Plaintiff was deployed overseas in active duty as a reservist. While Plaintiff was away, the MPD announced the opening of a corporal position, but Plaintiff was not informed of the job listing. After returning to Moultrie and learning that the position had been filled, Plaintiff filed a grievance on December 8, 2013, requesting "an equal opportunity for promotion." Chief Lang received the grievance a few days later and approved Plaintiff's taking the examination for promotion to corporal. Plaintiff passed the test and, on January 20, 2012, was promoted to corporal. (DSMF, ¶¶5-10).

Plaintiff's arrest of Brittany Herrod ("Herrod") on June 25, 2012 displeased his supervisors in the MPD. Plaintiff arrested Herrod for public indecency after learning that she had lifted her shirt while she was in Wal-Mart. A few weeks later, Herrod filed a complaint with the MPD regarding the arrest. Commander Seth Walters was tasked with investigating the incident, and he reviewed a video recording Wal-Mart had obtained of Herrod while she was in the store. The recording, which Plaintiff did not watch before the arrest, showed that Herrod had briefly lifted her shirt to remove something that one of her companions had

dropped down it. (Id. at ¶¶11-15; Plaintiff Depo., p. 98). Walters decided that Herrod, who was wearing a bra on the day of her arrest, had acted reasonably and that her breasts had never been exposed. He therefore concluded that she had not broken the law and that Plaintiff had violated departmental policy by arresting her without probable cause. When Plaintiff had arrested Herrod, the police camera on his body failed to record the encounter because its memory card was full. (Id. at 118-22; DSMF, ¶¶16-18). Walters determined that the camera's failure to record the arrest was another policy violation and consequently recommended that Plaintiff be suspended for two days. Based on Walter's investigation and recommendation, Chief Lang informed Plaintiff that he was being suspended for two days. (Id. at ¶¶19-20).

Plaintiff appealed the suspension, and Moultrie's city manager held a hearing on the appeal. The city manager decided that Plaintiff may have had probable cause to arrest Herrod but that the body camera's failure to record the incident was a policy violation. The city manager therefore reduced Plaintiff's discipline to a one-day suspension. (Id. at ¶¶21-24).

In late July 2012, Chief Lang received a letter from Hope Allen ("Allen"), who earlier that month had joined the MPD as a police officer, complaining of racially-insensitive behavior by Plaintiff. Allen is an African American, and Plaintiff had been assigned as her field training officer ("FTO"). As the FTO, Plaintiff was

Allen's supervisor and was expected to instruct her about the Department's policies and procedures and familiarize her with the City of Moultrie. In the letter to Chief Lang, Allen related that Plaintiff had used the laptop in his patrol car to show her videos of a female comedian[1] playing various characters, including a "black ghetto female" working at a Burger King and a "black flight attendant." Both characters were clearly based on negative stereotypes, and Allen perceived the stereotypes as being traditional, offensive portrayals of African Americans generally. (Id. at ¶¶25, 28-31, 33; Ex. K to Lang Aff.).

Allen's letter to Chief Lang also related how offensive she found Plaintiff's interactions with Shunell Borders ("Borders"), a female African-American officer with the MPD. Plaintiff had told Allen how one day an officer asked Borders if she wanted some Cracker Jacks, and she said no, she wanted some "Nigga Jacks." Later Borders was presented with a bag of Cracker Jacks that had been altered to read "Nigger Jacks." Plaintiff showed Allen a picture he had taken of Borders posing with the bag. (Id.; Plaintiff Depo., pp. 58-60; DSMF, ¶¶32, 34).

After getting Allen's letter, Chief Lang formed a panel of city employees to investigate the incidents described in the letter. Plaintiff appeared before the panel on July 26, 2012, and described the racially-based jokes that had occurred on his shift. He acknowledged having taken a picture of Borders holding the

---

[1] Allen's letter described the comedian as being a "white female," although Plaintiff's deposition testimony portrayed her as biracial. (Plaintiff Depo., pp. 53-54).

"Nigger Jacks" bag and having shown the picture to Allen. Following his appearance before the panel, Plaintiff provided it with a letter further addressing Allen's concerns. Plaintiff's letter admitted that he had "participated in racial comments" and that "[t]here [were] racist jokes made but not in the [manner] to offend or hurt one another." (Id. at ¶¶35-39, 41). He also admitted that he had shown the videos of the female comedian to Allen. On August 10, 2012, in response to Allen's complaints, Chief Lang placed Plaintiff on decision-making leave ("DML") for one day with pay. Chief Lang instructed Plaintiff to decide whether he was in the right profession and whether he was prepared to make the changes needed to succeed as a law enforcement officer. (Id. at ¶¶40, 42-43). Given that Plaintiff is still working for the MPD, he evidently satisfied Chief Lang that he was committed to his job. (Plaintiff Depo., p.23).

   Plaintiff claims that Hispanic and African-American police officers have received more favorable treatment from the MPD than he has because of their race. Fernando Hernandez ("Hernandez") is an Hispanic police officer with the MPD. Hernandez improperly arrested someone for public intoxication, and later he was forced to dismiss the charge. A formal complaint was never filed against Hernandez, and no disciplinary action was taken against him. (Id. at pp. 110-12; DSMF, ¶¶56-57, 82).

Based on reports of wrong-doing, the MPD investigated the activities of Lynn Johnson ("Johnson"), one of its African-American officers. The person who had reported Johnson later admitted that the allegations, evidently about sexual improprieties, had been fabricated. While Johnson has been working in the MPD, no one has filed a complaint that he solicited sexual favors from women, and no one has mentioned such behavior to Chief Lang. (Id. at ¶¶56, 58, 74-77).

Travis Stokes ("Stokes"), an African-American police officer with the MPD, has also come under suspicion. Stokes testified in a criminal trial after being subpoenaed as a character witness for the defendant. The prosecutor sought to undermine Stokes's testimony by arguing that he was flashing gang signs in a picture that was posted on Facebook. A subsequent investigation revealed that the purported gang signs were really symbols from Stokes's fraternity at Valdosta State University. (Id. at ¶¶56, 58, 78-81).

Another African-American police officer, Kizzie Richard ("Richard"), resigned from the MPD in November 2011 after being informed that she would be fired if she did not resign. She had earlier been suspended for seven days without pay for giving a false statement during a court proceeding. She was also placed on decision-making leave, or DML, for lying to a supervisor about completing a report. The MPD eventually told her that, because she had violated

departmental policy by improperly dismissing a case and by being inadequately prepared for work, she could either resign or be fired. (Id. at ¶¶56, 58, 69-73).

Plaintiff's pay from the MPD is comparable to what other officers earn. Because Plaintiff was not yet certified when he began working on the MPD, his starting salary was $12.29 per hour. However, his hourly wage rose to $13.29 per hour when he was promoted to corporal in January 2012, and he received a cost of living raise at the beginning of 2013 that increased his pay to $13.69 per hour. By comparison, LaToya Bell ("Bell"), an African American, started at $13.29 per hour, but she was already certified when she began with the MPD and had five years' experience in law enforcement. Bell also received a cost of living raise in 2013 that brought her salary to $13.69 per hour. Like Plaintiff, Richard started at a salary of $12.29 an hour, but, because she was already a certified law enforcement officer when she was hired, the MPD increased her salary to $12.66 per hour soon thereafter. (Id. at ¶¶56, 59-68).

Plaintiff brought suit against the City of Moultrie and the MPD in this Court on February 22, 2013. He alleges that they have racially discriminated against him by subjecting him to disparate treatment and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981a. He bases the discrimination claim on 1) his suspension from the MPD; 2) the delayed promotion to corporal; 3) his being placed on DML; and 4) his rate of

pay. (Complaint, Doc. 1, ¶¶5, 18, 26; DSMF, ¶¶52-54). Specifically with regard to the promotion, Plaintiff asserts that he "was wrongfully denied a promotion with the police department" while on active duty with the United States Air Force Reserve. (Complaint, ¶17). The Complaint also contains a retaliation claim under Title VII, although the factual basis for this count is unclear. (Id. at ¶5).

### III. Legal Analysis

The motion for summary judgment is granted because the undisputed material facts show that Defendants are entitled to judgment as a matter of law.

#### A. Claims against the Moultrie Police Department

The motion for summary judgment by the MPD is granted, and all of the claims against it are dismissed. The law does not recognize a police department as an entity that is capable of being sued. *See* Smith v. City of Unadilla, 510 F. Supp. 2d 1335, 1342 (M.D. Ga. 2007) (citing Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992) and Lovelace v. Dekalb Cent. Prob., 144 F. App'x 793, 795 (11th Cir. 2005) for this principle).

#### B. Title VII Claims against the City of Moultrie

The City of Moultrie's motion for summary judgment is also granted. If Title VII and § 1981 claims are based on the same set of facts, they are subject to the same analysis. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Title VII, as amended, makes it illegal for employers "to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a). A Title VII claim may be established through either direct or circumstantial evidence; however, if there is only circumstantial evidence, the claim is subject to the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See* Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Plaintiff claims that the City of Moultrie, through the actions of the MPD, has violated Title VII by subjecting him to disparate treatment, permitting a hostile work environment to exist, and retaliating against him. However, summary judgment demands dismissing all of these claims.

### 1.     Whether Plaintiff experienced disparate treatment

Summary judgment is granted on Plaintiff's disparate treatment claim. There is no direct evidence of discrimination, so this claim is subject to the McDonnell Douglas analysis. Plaintiff must first establish a *prima facie* case for disparate treatment, which requires showing that (1) he belongs to a protected classification; (2) he suffered an adverse employment action; (3) Defendants "treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do [his] job." Holifield, 115 F.3d at 1562.

Plaintiff fails to make out a *prima facie* case because he has not shown that similarly situated, non-Caucasian employees received better treatment from the MPD. Plaintiff claims he experienced racial discrimination with regard to his rate of pay, suspension, and being placed on DML.[2] However, Plaintiff did not contest Defendants' statement of material fact that his pay was comparable to what Richard and Bell earned based on their certifications and work histories. There is, thus, no dispute that these African-American officers were paid similarly to Plaintiff. As for Plaintiff's suspension for an improper arrest and failing to use his recording device, there is no similarly-situated police officer. Hernandez was not suspended after making an improper arrest, but there is no evidence about the circumstances of the arrest except that a formal complaint was never filed. Plaintiff does not even know if an investigation was conducted into Hernandez's improper arrest, as did occur after his arrest of Herrod. (Plaintiff Depo., p. 111). Finally, with regard to Plaintiff's DML assignment after Allen complained to Chief Lang, Plaintiff claims that other officers engaged in similar, race-based behavior with purportedly humorous intentions. However, there is no evidence that the MPD reacted any less sternly to these officers than it did to Plaintiff.

Plaintiff's claim cannot survive summary judgment because he has not established that he was subjected to disparate treatment in violation of Title VII.

---

[2] Plaintiff also claims his delayed promotion to corporal was discrimination, but he bases this claim on his military status rather than his race, which is addressed below.

Plaintiff's other complaints about how the MPD handled its officers differently based on their race were not adequately raised at the summary judgment stage, but even if they had been, they did not rise to the level of Title VII violations.[3] This claim is dismissed.

### 2. Whether Plaintiff suffered from a hostile work environment

Summary judgment also demands the dismissal of the hostile work environment claim. To establish such a claim Plaintiff must show that (1) he belongs to a protected group; (2) he experienced unwelcome harassment; "(3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment…" either directly or vicariously. Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010). Nothing in the record indicates Plaintiff experienced unwelcome race-based harassment that created an abusive

---

[3] Plaintiff also took offense to how Chief Lang publicly commented on Plaintiff's getting shot by a group of teenagers with a pellet gun, which caused a surface leg wound. Plaintiff felt that Chief Lang's comments showed sympathy for the teenagers and undermined the police force. Regardless, Plaintiff admitted he did not know of any non-Caucasian police officers who had been involved in a situation similar to his. (Plaintiff Depo., pp. 124-36, 145-47). In his deposition, Plaintiff also said that the MPD never disciplined non-Caucasian officers who engaged in non-marital sexual liaisons, became pregnant, ignored the chain of command, demonstrated gang affiliations, or performed poorly, which he claimed would not have been tolerated from Caucasian employees. However, when pressed he could not name a specific white officer who had been in similar circumstances and received less favorable treatment, but, more to the point, there is no evidence Plaintiff was ever himself in such a situation. (Id. at pp. 168-83).

working environment for him. Far to the contrary, Plaintiff repeatedly engaged in behavior with racial overtones himself but claims to have only been joking with fellow officers. The Court will not comment on the propriety of such conduct, but clearly Plaintiff was not harassing himself.

### 3. Whether Plaintiff was retaliated against in violation of Title VII

The retaliation claim is also dismissed. Although Defendants' motion for summary judgment does not expressly address retaliation, it seeks the dismissal of all the Title VII claims, and Plaintiff brought his retaliation claim under Title VII.[4] To establish a Title VII retaliation claim, a plaintiff must show that he "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-3(a); *see also* Dixon v. The Hallmark Cos., 627 F.3d 849, 856-57 (11th Cir. 2010).

There is no evidence that Plaintiff ever opposed or reported an employment practice by Defendants that was violating Title VII. Plaintiff has

---

[4] The Complaint alleges that "[t]his is a matter involving discrimination and retaliation upon the Plaintiff by his ultimate superior at the Moultrie Police Department, Chief Frank Lang, Senior. The actions of the Defendant are in violation of Title VII … and 42 USC Section 1981a [sic]." (¶5).

produced evidence that he protested when the MPD initially refused to allow him to take the corporal examination because he had been overseas serving in the military when it was administered. This evidence might relate to a violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq.*, but it does not show that the MPD was violating Title VII. Since the Complaint only alleges a retaliation count for Plaintiff's protected activity in response to Title VII violations, the retaliation claim is dismissed.

### C.  Other Claims against the City of Moultrie

Although the retaliation claim only concerned Title VII,[5] the Complaint also alleges that Plaintiff's "military status ha[s] resulted in hi[s] being subjected to a hostile work environment and disparate treatment," without expressly referring to the USERRA. (¶18). According to the Complaint, the MPD wrongfully denied Plaintiff a promotion within the department while he was on active duty with the United States Air Force Reserve.[6] (¶17). The USERRA states that, *inter alia*, a "person who … has an obligation to perform service in a uniformed service shall

---

[5] The USERRA contains an anti-retaliation provision, 38 U.S.C. § 4311(b), but Plaintiff has not brought a retaliation claim under the USERRA in this lawsuit, and it is not this Court's role to do so for him.

[6] According to Plaintiff's deposition testimony, the MPD also discriminated against him on the basis of his military status when it told him he had been overpaid for his annual military leave afforded by the department and required him to repay the money. (Plaintiff Depo., pp. 160-63). This claim was not included in the Complaint, but even if it had been, Plaintiff's later testimony in the deposition showed he was only speculating about his assertions. He testified that "I don't have any reason to believe that [the MPD] did or did not overpay me" and that "I'm not saying that I was overpaid, and I'm not saying that I wasn't overpaid." (Id. at 161, 162).

not be denied … promotion, or any benefit of employment by an employer on the basis of that … performance of service … or obligation." 38 U.S.C. § 4311(a). As the Eleventh Circuit has noted, "Section 4311 clearly mandates proof of discriminatory motive." Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005) (citations omitted). A plaintiff "must show by a preponderance of the evidence that his protected status was a motivating factor in [the employer]'s decision not to [promote] him." Id.

The claim that Plaintiff was discriminated against on the basis of his military status must be dismissed. Defendants do not refer to the USERRA in their motion for summary judgment, but they are clearly arguing for the dismissal of all of the claims against them and have articulated a thorough defense under Title VII,[7] which the Supreme Court has observed "is very similar to" the USERRA. Staub v. Proctor Hosp., ____ U.S. ____, 131 S.Ct. 1186, 1191, 179 L.Ed.2d 144 (2011). There is simply no evidence that Plaintiff experienced discrimination because of his service in the Air Force Reserve. While Plaintiff was serving with the reserve overseas in 2011, the MPD announced that a corporal position was open and eventually filled the position. Plaintiff did not learn of the opportunity while he was overseas, but there is no evidence that the information was kept from him because of animus toward his military status. He

---

[7] "[T]here is no evidence sufficient to sustain any verdict or judgment in favor of Plaintiff…." (Defendants' Motion for Summary Judgment, ¶2).

returned home in October 2011. As Plaintiff testified in his deposition, "when I came home … I was told by Chief Lang that I wasn't promoted because I wasn't here." (Plaintiff Depo., p. 149, 153-55). After seeking advice from a military service organization, Plaintiff filed a grievance with the City of Moultrie on December 8, 2011 that was received by the human resources department on December 12. The same day, Chief Lang received a copy of the grievance and gave his approval for Plaintiff to take the corporal examination. After Plaintiff passed the examination, he was promoted to corporal on January 20, 2012. (Id. at 149; Lang Aff., ¶¶5-9; Ex. A, B, C to Lang Aff.). The fact that Plaintiff was not promoted earlier because he was not present to take the examination is not proof of discriminatory animus. Plaintiff was promoted to corporal soon after he became eligible for the promotion, and nothing in the record suggests that the MPD unreasonably delayed accommodating his taking the corporal examination.

## IV.  Conclusion

In light of the foregoing analysis, the Motion for Summary Judgment (Doc. 17) by the City of Moultrie and the MPD is granted, and this case is dismissed.

**SO ORDERED**, this the 1st day of August, 2014.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

scr